**In the Matter of Uzmah SAGHIR.**

**No. M–2–238.**

United States District Court,
S.D. New York.

July 8, 2009.

Sandro Rodas, New York, NY, pro se.

**OPINION AND ORDER**

JED S. RAKOFF, District Judge, for the Committee on Grievances:

This matter comes before the Committee on Grievances for the United States

District Court for the Southern District of New York (the "Committee") to consider the imposition of discipline against Respondent Uzmah Saghir (the "Respondent"), an attorney admitted to the Bar of this Court on July 19, 2002, based in part on the allegations of an individual ("Client Roe") who retained Respondent in connection with a motion pursuant to 28 U.S.C. § 2255. For the reasons set forth below, the Committee has determined to issue an interim order of suspension of the Respondent pending final resolution of formal charges that this Committee has now filed against Respondent. *See* Statement of Charges, *In re Saghir*, No. M–2–238 (S.D.N.Y. June 29, 2009).

It should be noted at the outset that on June 2, 2009, the United States Court of Appeals for the Second Circuit issued an order temporarily suspending Respondent from the Bar of that Court pending completion of proceedings of the Court's Committee on Admissions and Grievances. Pursuant to Local Rule 1.5(b)(2), the Committee would ordinarily impose an interim suspension of Respondent on that basis alone. However, in light of the facts thus far established by this Committee's pending investigation, there are additional and independent reasons for imposing an interim suspension here, as set forth below.

On November 1, 2002, Client Roe was charged with various narcotics offenses in this District. Client Roe pled guilty on January 12, 2004, and was sentenced on July 20, 2005, to a term of 14 years' imprisonment, and five years' supervised release. Client Roe is currently serving his sentence at a federal prison outside of this District ("Federal Prison X").

In mid-April 2007, Client Roe retained Respondent through family members in connection with a motion to be made pursuant to 28 U.S.C. § 2255. On April 30, 2007, a Notice of Motion dated April 26, 2007, made pursuant to 28 U.S.C. § 2255, for an Order to Vacate, Set Aside, or Correct the Sentence was filed and a return date of May 30, 2007 was set (the " § 2255 Motion"). The § 2255 Motion was signed by Client Roe, but Respondent's name appears in the lower left hand corner of the first page of the document as a recipient of the Motion.

More than six months later, on November 13, 2007, Respondent attempted to electronically file a Notice of Appearance and letter dated "July 3, 2007" requesting a conference on the § 2255 Motion.[1] The filings were rejected because the matter was a non-ECF case. On November 29, 2007, Respondent manually re-filed the Notice of Appearance, but did not re-file the letter requesting a conference.

No conference was held, nor was there any other activity in connection with the § 2255 Motion until September 17, 2008 when, following communications between Client Roe and the *pro se* office of this Court, a civil matter was opened and the § 2255 Motion was filed.

On or about October 8, 2008, Client Roe wrote a letter to the district judge assigned to his criminal matter complaining about Respondent's representation of him in connection with the § 2255 Motion. The district judge referred Client Roe's

---

**1.** Client Roe's criminal case had originally been assigned to a different district judge. Respondent erroneously noted that judge as the assigned judge on her Notice of Appearance and letter. Client Roe had complained about Respondent to the Departmental Disciplinary Committee for the First Judicial Department in or around July 2008. His complaint was forwarded to the Grievance Committee for the Second and Eleventh Judicial Districts. In or about August 2008, Respondent was notified of Client Roe's complaint. This was the first of a number of complaints by Client Roe about Respondent.

complaint to this Committee. On December 1, 2008, the Committee issued an Order to Show Cause directing Respondent to show why the Court should not censure, suspend, or strike her name from the roll of attorneys admitted to practice before this Court. On December 19, 2008, Respondent submitted an Affirmation in response to the Order to Show Cause (the "Saghir Affirmation").

On January 29, 2009, the Committee appointed Celia Goldwag Barenholtz, Esq. of Cooley Godward Kronish LLP ("Investigating Counsel"), a member of the panel of attorneys appointed to advise and assist the Committee on Grievances, to investigate as necessary and prepare such statement of charges as the Committee deems warranted.

■ Client Roe was deposed by Investigating Counsel on April 8, 2009. Client Roe asserted that he learned about the services of Respondent through another inmate ("Inmate Doe") at Federal Prison X after Client Roe saw a flyer advertising the legal services of the "Federal Imprisonment Reduction Experts, LLC" or "F.I.R.E." in the prison library. Inmate Doe informed Client Roe that the flyer described services that Respondent could provide. Inmate Doe told Client Roe that he worked together with Respondent: Inmate Doe obtained clients and prepared motions, and Respondent executed the motions and did anything that had to be done on the outside. After collecting Client Roe's legal documents, Inmate Doe informed Client Roe that Respondent had analyzed the case and determined that the fee for her services would be $15,000. $5,000 was to be paid upfront, and the remaining $10,000 was to be paid after the Client prevailed on his motion and was released from prison. Inmate Doe promised Client Roe that he would be released from prison by November or December 2007.

Client Roe testified that members of his family met with Respondent in her office in Brooklyn, paid her $5,000, and received a receipt in return. Client Roe stated that after Respondent was paid the $5,000 fee, Client Roe saw Doe typing the § 2255 Motion in the prison library. After Doe finished the Motion, Client Roe signed the document and returned it to Doe. Doe later told Client Roe that he had sent the Motion to Respondent.

Client Roe further testified that he has never had any direct contact with Respondent. Any and all communication with her was conducted through Inmate Doe or members of his family. Inmate Doe told Client Roe that Respondent would be visiting Client Roe, but no such visits occurred. Client Roe wrote to Respondent on June 23, 2008, seeking her opinion of his present situation and asking her to respond in writing. Client Roe testified that he received nothing in response from Respondent. Client Roe further testified that his family was unable to reach her by phone after her retention in April 2007.

Client Roe testified that he never signed or received a retainer agreement from Respondent.

In an initial response to the Order to Show Cause, submitted on December 18, 2008, Respondent generally denied any misconduct on her part. *See* Saghir Affirmation. She averred that she had two meetings with members of the Client Roe's family. During the initial meeting, the family members informed her that they had been referred to her by "Federal Imprisonment Reduction Experts."[2] Re-

---

**2.** "Federal Imprisonment Reduction Experts" or "F.I.R.E." was a company operated by Respondent's brother, Faizan Saghir. The Affirmation of Faizan Saghir, attached as Ex-

spondent asserted that Client Roe's family provided her with a draft of the § 2255 Motion and advised her that Client Roe wanted to file the motion *pro se* because he had had bad experiences with lawyers and wanted to be sure that the arguments he wanted to present were in fact in his motion. Respondent asserted that they requested that she act as Client Roe's legal advisor until a response on the *pro se* motion was received from the government, at which time she would file a reply and assume the role as lead counsel for Client Roe. Respondent accepted the offer and advised the family members of her fees.

In the Saghir Affirmation, Respondent further claimed that shortly after her initial meeting with Client Roe's family, she forwarded a written retainer agreement to Client Roe, and subsequently received an executed copy of the agreement from Client Roe via mail. Respondent attached to her affirmation an executed copy of a retainer agreement dated April 26, 2007 (the "Retainer Agreement"). The Retainer Agreement provides that Respondent would charge a "flat fee" of $15,000, and that "[a]n initial retainer of $5,000 is due immediately and the sum of $10,000 will be due once the reply is filed in this matter." The Agreement further provides: "As per

your instructions, you will file your § 2255 motion pro se (which we have seen a copy of) we will only docket our appearance and proceed in the above matter after the government has filed a reply to your pro se motion and act only as your advisors until that point." [3]

Respondent further asserted that she again met with members of Client Roe's family on April 23, 2007, at which time she received $5,000 as a retainer, with the understanding that the remaining fee would be paid as agreed upon in the retainer agreement. Respondent provided a receipt for $5,000 to Client Roe's family. Respondent asserted that during this meeting, she was advised that Client Roe had filed the § 2255 Motion *pro se*. Respondent claimed to have subsequently reviewed the docket and confirmed that the Motion had in fact been filed *pro se* on April 30, 2007, with a return date in May 2007.

Respondent stated that it was her understanding that the § 2255 Motion was written by Inmate Doe at Client Roe's request, and was signed and mailed by Client Roe himself. Respondent asserted that "[n]either the preparation of that motion, nor its filing was done at my direction

---

hibit 2 to the Saghir Affirmation, states that he and other family members (but not Respondent) founded F.I.R.E., and operated it as a legal research organization from early 2007 until the beginning of May 2007. Faizan Saghir created the F.I.R.E. flyer and, through searches on the Federal Bureau of Prisons website for common names such as "Jack Smith" or "Jose Gomez," sent it to inmates in prisons throughout the nation. Faizan Saghir averred that F.I.R.E. received a call from an individual whose brother was an inmate at Federal Prison X, and referred that individual to Respondent, but that Respondent was not associated with F.I.R.E. at any time. Notably, in April 2007, both Respondent and F.I.R.E. operated out of the same building at 111 Livingston Street in Brooklyn.

**3.** As noted above, Client Roe testified that he had not seen the Retainer Agreement prior to the Investigation, and testified that the signature on the last page is not his.

Federal Prison X maintains a log of incoming correspondence that has been marked by the sender as "Special Mail," a designation which may be used by attorneys and courts, as well as certain other legal and governmental entities, and which is intended to ensure that the correspondence will be opened only in the presence of the inmate. The records produced by Federal Prison X to Investigating Counsel reflect no incoming Special Mail to Client Roe from Respondent. We note that Respondent is familiar with the Special Mail procedures, as correspondence from her to Inmate Doe is recorded in the log.

or under my supervision." Respondent specifically denied compensating Inmate Doe: "I provided no compensation to [Inmate Doe] for assistance of [Client Roe] with either legal research or the drafting of the motion."

Respondent explained that due to a complicated pregnancy beginning in January 2008, she required bed rest and used her office only on a "need to" basis for several months. Respondent claimed that during that time, she spoke with Client Roe's niece and informed her that she was out of the office but was keeping an eye on Client Roe's docket. Respondent asserted that she had a miscarriage in April 2008, and subsequently worked on a part time basis and mostly from home. Respondent further noted that in July 2008, Respondent's grandmother passed away. Respondent went to England to be with her family, and did not return until mid August 2008. Respondent stated that she had not been in her office from April 2008 to September 2008.

Respondent claimed that she had written a letter to Client Roe on September 3, 2008, informing him that she would be withdrawing as his counsel in this matter (the "September 3, 2008 Letter"). Respondent attached an unsigned copy of the September 3, 2008 Letter as an exhibit to her Affirmation. In that Letter, Respondent writes, "After careful review of the record in this case I have concluded that it will not be in your best interest at this point to pursue the matter any further and for that reason you should withdraw your pro se motion." Respondent offers no explanation of what prompted her to come to this conclusion over 16 months after her retention or why she did not reach this conclusion in April 2007, if, as she con-

tends, she saw a draft of the Motion at that time.[4]

Finally, Respondent averred that in or around September 2008, she returned $4,720 of the $5,000 received from Client Roe's family to Client Roe. Respondent variously claimed that she kept $280 for her review of the § 2255 Motion and for filing the Notice of Appearance.

After reviewing these competing allegations, Investigating Counsel, pursuant to authority granted by this Committee, sent a letter to the Warden of Federal Prison X, requesting records concerning Respondent's visits to and communications with inmates at Federal Prison X. On March 30 and April 6, 2009, Investigating Counsel received documents which show the following:

(1) From April 21, 2007 through September 16, 2008, Inmate Doe received 14 separate payments from either Respondent or her brother Faizan Saghir. The payments total $5,450. The individual payments range from $200 to $750 and were made on a nearly monthly basis.

(2) From February 2007 through August 2008, Respondent arranged to visit or visited Inmate Doe on 14 occasions. Three of the visits to Inmate Doe occurred between January 2008 and April 2008—during the time Respondent claims to have required bed rest as much as possible.

(3) From February 2007 through April 2008, Inmate Doe received "Special Mail" from Respondent on twelve separate occasions.

(4) From April 1, 2007 to October 1, 2008, Respondent neither visited nor sent "Special Mail" to Client Roe.

4. Client Roe denied receiving the September 3, 2008 Letter, and the records supplied by Federal Prison X do not reflect Special Mail from Respondent to Client Roe in September 2008. See n. 5 supra.

In view of this information seemingly in direct contradiction to the Saghir Affirmation, the Investigating Counsel prepared to take Saghir's deposition. In preparation for the deposition, the Committee, at the request of the Investigating Counsel, issued a Subpoena *Duces Tecum* to Respondent dated March 10, 2009, and returnable March 27, 2009, requesting, *inter alia,* documents concerning Client Roe and Inmate Doe; the Retainer Agreement, including the original Agreement, any envelopes in which it was sent or received, and any documents, such as a cover letter, that accompanied it; documents concerning Respondent's relationship with F.I.R.E.; documents concerning any arrangement with or payments to Inmate Doe or any other inmate at Federal Prison X; Respondent's cellular and office telephone records; financial records concerning payments made by her to Inmate Doe; and documents concerning communications between Respondent and Inmate Doe concerning Client Roe. On April 16, 2009, Respondent sought an extension of time to respond, and her time was extended to May 8, 2009. On May 11, 2009, Investigating Counsel received a response in which Respondent invoked her Fifth Amendment privilege against self incrimination with respect to each of the 17 enumerated document requests. On May 15, 2009, Investigating Counsel sent Respondent a letter inquiring whether she would assert the Fifth Amendment in connection with her deposition in this matter, and Respondent answered that she intended to do so.

■ An adverse inference may be drawn when an attorney asserts her Fifth Amendment privilege against self-incrimination in a proceeding before a disciplinary committee. *See In re Muraskin,* 286 A.D.2d 186, 187, 731 N.Y.S.2d 458 (1st Dep't 2001) (An adverse inference "may be drawn from respondent's invocation of the Fifth Amendment privilege against self-incrimination at his deposition before the [Departmental Disciplinary Committee]"); *In re Boter,* 46 A.D.3d 1, 7, 842 N.Y.S.2d 411, 420 (1st Dep't 2007) (same); *In re Wallman,* 260 A.D.2d 148, 150, 696 N.Y.S.2d 164, 165 (1st Dep't 1999) (suspending attorney where uncontested evidence before the Departmental Disciplinary Committee included affidavits of his clients and the adverse inference drawn from the respondent's invocation of privilege).

The facts thus far established, coupled with the adverse inference drawn from Respondent's invocation of her Fifth Amendment privilege, establish a clear basis for interim disciplinary action. The preliminary remedy of an interim suspension is available in such instances to protect the public from future disciplinary violations of the respondent during the pendency of proceedings before this Committee. *See In re Peters,* 543 F.Supp.2d 326 (S.D.N.Y.2008). In light of the serious nature of the allegations against Respondent, the danger that others will be similarly harmed (a concern that is highlighted by Investigating Counsel's receipt of complaints from other inmates at Federal Prison X since the Order to Show Cause was issued), the Committee's inability to entertain an alternative innocent explanation for Respondent's conduct given her refusal to provide documents or testimony to Investigating Counsel, and the fact that Respondent's misconduct is aimed at particularly vulnerable clients in the form of inmates who are not sophisticated about the legal system, and who may maintain unrealistic hopes about post-conviction relief, the Committee concludes that an interim suspension of Respondent from the practice of law before this Court pending the final outcome of the Investigation is warranted. *See, e.g., Peters,* 543 F.Supp.2d at 329; *In re Balcacer,* 293

A.D.2d 107, 109, 740 N.Y.S.2d 192, 193 (1st Dep't 2002).

The New York Code of Professional Responsibility (the "Code")[5] Disciplinary Rule ("DR") 6–101(A)(3) states that a lawyer shall not "neglect a legal matter" entrusted to her. DR 7–101(A)(1) prohibits a lawyer from failing to seek the lawful objectives of the client through reasonable available means. DR 7–101(A)(2) provides that a lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services.[6]

Respondent accepted $5,000 from Client Roe's family, and, with the exception of filing a Notice of Appearance nearly seven months after being retained, did no legal work on his behalf. When her letter requesting a conference was rejected as improperly filed, she did not resubmit it, nor did she do anything thereafter to bring the § 2255 Motion to the Court's attention. Indeed, other than reviewing the § 2255 Motion before it was filed and entering an appearance, Respondent does not claim to have done anything other than check the docket.[7] Respondent claims to have withdrawn from her representation of Client Roe by letter dated September 3, 2008. Putting aside the question of whether that letter was ever sent, Respondent did not withdraw her Notice of Appearance or seek the permission of the Court to withdraw as counsel. Even if this Committee were to credit Respondent's assertion that she was hired merely to serve as a legal advisor until after the government filed a response to the § 2255 Motion (a claim that is belied by the fact that she entered an appearance prior to the government's response), her conduct reflects complete neglect of her client's matter.

The evidence also indicates that Respondent did not make herself available to Client Roe or his family, and ignored attempts by members of his family to communicate with her. Client Roe testified that members of his family tried to contact Respondent throughout the time that she was retained by him, but were unable to contact her. The record further indicates that Client Roe wrote to Respondent on June 23, 2008, but Respondent did not answer this letter.

Respondent's attempt to justify her unavailability and her failure to act on his behalf do not excuse her conduct. Respondent asserted that she was required to be on bed rest as much as possible, was working on a part-time basis, and was out of the country at various times from Janu-

5. On April 1, 2009, New York Courts replaced the existing disciplinary rules and definitions in the New York Code with the New York Rules of Professional Conduct. The Committee reaches its decision applying the rules in effect as of Respondent's conduct, but notes that the disciplinary rules cited herein are consistent with the newly-adopted Rules.

6. The Order to Show Cause lists potential violations of 2–103(A)(1), 1–104(D), 2–101, 3–101, 3–102, and 7–101. Although Respondent's violations of these provisions are sufficient to warrant the discipline we now impose, we address these additional provisions to further illustrate the severity of Respondent's misconduct and the need for an interim suspension.

7. In a letter to the Grievance Committee for the Second and Eleventh Judicial Districts, dated November 10, 2008, Respondent stated that she spoke to Chambers on two occasions to inquire about the status of Client Roe's Motion. Investigating Counsel cannot investigate these allegations as it is not clear from her letter when she purportedly made these inquiries or to whom she spoke. The Committee is skeptical of Respondent's claim, as it finds it unlikely that calls to chambers of a judge in this District would not have caused the § 2255 Motion to be properly docketed as a civil matter.

ary 2008 until the middle of August, 2008. But the uncontested evidence indicates that during this time, she made trips to Federal Prison X to visit Inmate Doe, wired money to Doe, and communicated with Doe by mail. It appears that her condition would not have prevented her from communicating with Client Roe or his family during this time.[8]

By neglecting the matter of her client and by failing to communicate with her client, Respondent violated DR 7–101(A)(1), DR 7–101(A)(2), and DR 6–101(A)(3). *See, e.g., In re Blumrosen,* 253 A.D.2d 239, 687 N.Y.S.2d 357 (1st Dep't 1999) (where respondent agreed to represent clients and accepted retainers from clients, then did little if any work on clients' behalf, and further failed to communicate with clients, conduct constituted violation of, *inter alia,* DR 6–101(A)(3) and DR 7–101(A)(1)); *In re Kudisch,* 290 A.D.2d 43, 44, 733 N.Y.S.2d 731 (2d Dep't 2001) (by failing to respond to inquiries from client's family, attorney violated DR 6–101(A)(3)); *In re Zacek,* 54 A.D.3d 84, 85, 859 N.Y.S.2d 886, 887 (attorney who failed to respond to messages from clients and failed to appear for scheduled appointments with clients violated, *inter alia,* DR 6–101(A)(3)).[9]

■ DR 1–102(A)(3) prohibits a lawyer from engaging in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer. DR 1–102(A)(4) prohibits conduct involving dishonesty, fraud, deceit or misrepresentation. DR 1–102(A)(5) prohibits conduct prejudicial to the administration of justice. The record before this Committee, coupled with the adverse inference drawn as a result of Respondent's invocation of the Fifth Amendment, establishes violations of DR 1–102 by Respondent both with respect to her conduct *vis a vis* Client Roe and her conduct *vis a vis* this Committee.

*First,* with respect to Client Roe, Respondent accepted $5,000 from Client Roe's family with the understanding that she would provide legal services to Client Roe in return. Instead, Respondent instructed or permitted Inmate Doe—a non-lawyer—to draft and file the § 2255 Motion. The Committee does not believe that

---

8. Respondent asserted that she spoke to members of Client Roe's family on a number of occasions—including during the time that she was working from home. She further stated that she had not been aware that either Client Roe or any of his friends of family had otherwise been attempting to contact her. The Committee puts no weight on these assertions given Respondent's refusal to testify.

9. The record demonstrates other violations of the Disciplinary Rules. For example, the use of F.I.R.E. or other inmates to solicit legal business violates DR 2–103(A)(1) and DR 2–101. *See In re Lajoy,* 279 A.D.2d at 695, 719 N.Y.S.2d at 720 (respondent violated DR 2–103 and 3–102 by acquiescing in an inmate's solicitation of other prisoners on respondent's behalf and sharing legal fees with inmate who helped prepare appellate briefs). By compensating Inmate Doe for obtaining clients for Respondent (in violation of DR 2–103(D)) and for his "legal" work—the only conclusion that

this Committee can at this point draw from the record given Respondent's invocation of her privilege against self-incrimination—Respondent also aided a non-lawyer in the unauthorized practice of law in violation of DR 3–101, and shared fees with a non-lawyer in violation of DR 3–102. *In re Abbott,* 167 A.D.2d 617, 620–21, 563 N.Y.S.2d 848, 850–51 (3d Dep't 1990) (attorney violated DR 3–101 by allowing a non-lawyer to perform legal work, including research and preparation of motions, on attorney's behalf); *In re Lajoy,* 279 A.D.2d at 695, 719 N.Y.S.2d at 720. By withdrawing as counsel without seeking permission from the court and without any further explanation or effort to ensure that her actions would not prejudice her client, Respondent engaged in conduct in violation of DR 2–110(A)(2). Finally, by charging $5,000 for doing no more than watching a docket, Respondent charged an excessive fee in violation of DR 2–106.

Client Roe or his family would have paid $5,000 to Respondent to secure the extraordinarily limited legal services described in the purported Retainer Agreement. The Committee finds that Client Roe reasonably believed he was retaining Respondent as his attorney in connection with the § 2255 Motion. *See In re Lajoy,* 279 A.D.2d 695, 719 N.Y.S.2d 719, 720 (3d Dep't 2001) (an attorney who paid a state inmate to help prepare appellate briefs in cases in which attorney was assigned or retained, shared legal fees with the inmate, and acquiesced in the inmate's solicitation of other prisoners was found to have violated, *inter alia,* DR 1–102(A)(4) and (5), and was suspended); *In re Kudisch,* 290 A.D.2d at 44, 733 N.Y.S.2d at 731 (attorney who accepted retainer fee, conducted no work on client's behalf, and failed to reimburse unearned fee until after client complained to grievance committee violated DR 1–102(A)(4)).

*Second,* Respondent has been dishonest in her dealings with this Committee. In response to the Order to Show Cause, Respondent submitted an eight page Affirmation pursuant to 28 U.S.C. § 746. The record developed to date, coupled with the adverse inference the Committee draws based on Respondent's invocation of her Fifth Amendment privilege against self-incrimination, indicates that Respondent misled the Committee in at least the following respects:

(1) Respondent averred that the § 2255 Motion was not prepared at her direction or supervision and that she did not compensate Inmate Doe for preparing and filing it. The records received from Federal Prison X indicate that Respondent visited Inmate Doe on numerous occasions and that Inmate Doe received 14 separate payments from Respondent or her brother totaling $5,450. The Committee finds that at least some of these visits concerned the provision of legal services by Doe to Client Roe and other inmates, and that at least some of these payments were to compensate Inmate Doe for obtaining Client Roe as a client and drafting and filing the § 2255 Motion for him.

(2) Respondent provided this Committee with a Retainer Agreement bearing what purports to be Client Roe's signature. Respondent claims that that she sent the Retainer Agreement to Client Roe and received an executed copy from him by mail. Client Roe denies having seen or signed the Agreement, and the records produced by Federal Prison X do not reflect that it was sent to Client Roe as "Special Mail." [10] The Committee finds that the Retainer Agreement was created after the fact to justify the limited legal services Respondent provided Client Roe. *In re Boter,* 46 A.D.3d 1, 5–7, 842 N.Y.S.2d 411, 418–420 (1st Dep't 2007) (disbarring attorney whose conduct included causing employees to forge client's signature and filing falsified retainer agreements with the Office of Court Administration, in violation of, *inter alia,* DR 1–102(A)(3) and (4)).

(3) Respondent described various conditions and the like that purportedly justify her failure to communicate with Client Roe's family members who tried to reach her during this period. However, during the same period she was allegedly incapacitated, Respondent visited Inmate Doe (which required travel from New York) at least three times.

---

**10.** We note that the signature on the Retainer Agreement includes only part of Client Roe's name, omitting one of his middle names. Client Roe has asserted that he always signs documents with his full name. Investigating Counsel has reviewed other documents signed by Client Roe, and has seen no other that is signed in the same manner as the Retainer Agreement.

In sum, Respondent was given the opportunity to refute Client Roe's complaint, to provide evidence in support of her assertions, and to offer an explanation for the series of payments totaling $5,450 to Inmate Doe, but chose not to do so. In this civil matter, the Committee may infer that truthful answers to questions about her representation of Client Roe, her relationship with F.I.R.E., and her relationship with Inmate Doe would have been incriminating. In light of the uncontested evidence, and the adverse inference we draw, we are left to credit the evidence indicating that Respondent lied in the Affirmation she submitted to this Court.[11] *See In re Abbott,* 167 A.D.2d 617, 621, 563 N.Y.S.2d 848, 850 (3d Dep't 1990) (attorney who attempted to mislead or deceive the disciplinary committee violated DR 102(A)(4) and (5)).

Accordingly, for the reasons set forth above, Respondent is hereby suspended from practicing in the Southern District of New York pending the outcome of the Investigation and until further order of this Court.

SO ORDERED.

---

11. New York State procedures make clear that an attorney respondent has a duty to cooperate with an investigation into allegations of misconduct. *In re Lynch,* 115 A.D.2d 70, 71, 499 N.Y.S.2d 735, 736 (1st Dep't 1986); *see also In re Pikna,* 101 A.D.2d 588, 589, 476 N.Y.S.2d 140 (1st Dep't 1984) (suspending respondent who failed to comply with subpoena for records without any justification, asserted his privilege against self incrimination at his deposition, and was deemed to have "willful[ly] and deliberate[ly]" failed to cooperate in violation of 22 NYCRR 603.15(e)); *In re Boter,* 46 A.D.3d at 8, 842 N.Y.S.2d at 420 (respondent's failure to cooperate with committee's investigation resulted in interim suspension); *In re Coughlin,* 95 A.D.2d 64, 65, 465 N.Y.S.2d 180 (1st Dep't 1983) (finding respondent's failure to cooperate with petitioner a violation of DR 1-102(A)(5)(conduct by an attorney that is prejudicial to the administration of justice)). We think a similar duty applies here, given our findings concerning Respondent's actual representation of Client Roe, and her lack of candor with this Committee, we do not suspend Respondent on an interim basis for her failure to cooperate.